CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED for RJAQ
DEC 13 2010
JULIA C. DUDLEY, CLERK
BY: H McDonaco
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| JACOB D. PEYTON, ) | Civil Action No. 7:09-cv-00492 |
| Plaintiff, ) | |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| BRYAN WATSON, et al., ) | By: Hon. Jackson L. Kiser |
| Defendants. ) | Senior United States District Judge |

Plaintiff Jacob D. Peyton, a Virginia inmate proceeding pro se, filed a civil rights complaint pursuant to 42 U.S.C. § 1983 with jurisdiction vested in 28 U.S.C. § 1343. Plaintiff names as defendants Bryan Watson, Warden of the Wallens Ridge State Prison ("WARSP"); Mr. Harvey, Assistant Warden of the WARSP; Correctional Officers R. Robinson and Sergeant Carico; and Ms. Scarberry, WARSP's Food Service Manager. Plaintiff alleges that the defendants are liable for using excessive force against him and feeding him poor quality food, in violation of the Eighth Amendment. Plaintiff requests an injunction and $25,000 from each defendant. Defendants filed a motion for summary judgment, and plaintiff responded, making the matter ripe for disposition. After reviewing the record, I deny plaintiff's motion for reconsideration and grant in part and deny in part defendants' motion for summary judgment.[1]

I.

A.

Plaintiff alleges the following facts in his verified complaint. Plaintiff was in the

---

[1] I also deny plaintiff's motion for reconsideration (no. 39). In this motion, plaintiff claims that the defendants have not provided the court with the best camera footage of the incident from a camera "connected to Gunpost #1 outside on the C-D side." The court requested the defendants to respond about the availability of the camera footage from this camera. The court noted in its order that it understood it may have already received this footage but it was unfamiliar with all the cameras' locations and descriptions of their locations. The defendants acknowledged in their response that they already provided this footage to the court for in camera review. This footage, however, does not provide any pertinent information about the incident.

WARSP cafeteria and brought his food tray to the juice machine. Defendant Carico approached plaintiff and told him to leave his tray on the inmate eating table before going to the juice machine. Plaintiff and Carico briefly conversed, and Carico ordered plaintiff to go outside the mess hall.

They both walked outside with three feet between them, and Carico told plaintiff to turn around to get handcuffed. Carico allegedly called to another officer, defendant Robinson[2], saying plaintiff was a "smartass muslim." Carico and Robinson then suddenly "slammed" plaintiff to the ground face first with his left arm pinned under his body, his right arm twisted behind his back, and his legs pulled up toward his back, making a U-shape. Carico smacked his knee on the back of plaintiff's head, allegedly causing plaintiff's lip to be cut, a tooth to become loose[3], and have his face scraped against the ground. Robinson then punched plaintiff in the face while he was lying on the ground, allegedly calling him a "fucking nigger", while Carico told plaintiff to stop resisting and tried to pull plaintiff's left arm out from underneath him. Carico and Robinson placed plaintiff in backwards leg irons that were too tight, which allegedly caused cuts, pain, and scars. Once he was secured, plaintiff was afraid of a K-9 and an officer's boot so close to his head.

Defendant Watson arrived at the scene, asked plaintiff what happened, and plaintiff "said nothing." Plaintiff painfully walked to medical because of the leg irons. Plaintiff received

---

[2] Plaintiff named C/O Roberts as a defendant, but the defendants acknowledged that the officer is properly identified as R. Robinson. Plaintiff also acknowledged that he intended to name R. Robinson. C/O Roberts is still listed as an unrepresented defendant; therefore, the Clerk shall terminate C/O Roberts as a defendant but R. Robinson shall continue to be a defendant.

[3] Plaintiff acknowledges in the complaint that the tooth was still in his mouth but that it was medically necessary to remove the tooth as a result of the incident. (Compl. 3.)

2

medical treatment for his wounds that consisted of ointment on his scrapes. Plaintiff was then immediately assigned to the special housing unit ("SHU"). Correctional officer Coleman punched plaintiff a couple of times in the back of the head before placing him in his cell.

Carico filed four institutional charges against plaintiff, and the institutional hearing officer found plaintiff guilty of them. One charge was attempted assault on Carico. Carico claimed that plaintiff swung his fist at Carico while they were outside the mess hall. Plaintiff believes that the warden overturned and expunged this conviction.

Plaintiff weighed 182 pounds when arrived at the WARSP in April 2009 and weighed just over a 190 pounds a month later at the time of the incident. However, plaintiff alleges that he lost fourteen pounds during his two and a half month stay in segregation. Plaintiff refused to eat the meal trays served to him in the SHU for the first two days because the food allegedly had tobacco and tobacco spit in it. Plaintiff complains that the food portions in the SHU are too small and are served on small trays that have only three spots for food. Plaintiff further complains that he and other inmates in the SHU are not allowed to buy food from the commissary but are permitted to buy non-food items. Plaintiff claims that the available activities in the SHU are only reading, sleeping, and eating; he feels depressed while in the SHU; and his depression contributes to his weight loss.

B.

The defendants filed a motion for summary judgment supported by the affidavits of the WARSP grievance ombudsman, chief nurse, and defendants. The defendants aver the following facts in support of their motion for summary judgment. On May 29, 2009, Carico was monitoring the feeding of the evening meal. Carico approached plaintiff and told him to remove his tray

from the drink area and sit down at a table. Plaintiff cursed, made remarks to the effect that he is a grown man, and became belligerent. Due to his attitude, Carico ordered him to walk outside the cafeteria. Carico held the door so plaintiff could exit the cafeteria, but plaintiff intentionally bumped into Carico on the way through the door. Outside in the hallway, Carico asked plaintiff to face the wall so he could be searched for contraband.

Robinson was working as the yard officer for the area and was primarily responsible for checking the master pass list and controlling inmate movement through the yard. At the time of this incident, inmate movement was mostly to the cafeteria. Robinson was near the cafeteria when he observed Carico and plaintiff exit from it.

As Carico stood behind plaintiff, who was facing the wall and being patted down for contraband, plaintiff turned around and swung his fist at Carico's face. Robinson immediately assisted Carico to control and restrain plaintiff. Carico and Robinson fell to the ground while plaintiff struggled against Carico's and Robinson's attempts to apply restraints. Carico and Robinson ordered plaintiff to stop resisting and to put his hands behind his back so restraints could be applied. While plaintiff continued to struggle, two members of security staff assisted Carico and Robinson to successfully restrain plaintiff. Harvey arrived at plaintiff's location and asked him what was going on. Plaintiff responded only that he was sick.

WARSP staff escorted plaintiff to the medical department where he was checked by medical staff at approximately 3:55 p.m. The record reflects that plaintiff had two abrasions, approximately 2 to 3 centimeters in size on his left check, a 1/8 centimeter abrasion on his left eyebrow, an approximately 1/8 centimeter laceration on the right lower lip, and an approximately half dollar sized abrasion on his right cheek. The nurse wrote that plaintiff had no other visual

injuries and voiced no other complaints. Medical staff cleaned the wounds with saline and antibiotic ointment. Staff advised plaintiff to keep the wounds clean with soap and water and to follow-up with medical staff as needed.

On May 29, 2009, WARSP officials charged plaintiff with four offenses: #198/105A - attempted aggravated assault upon a non-offender for swinging a closed fist at Carico; #201 - disobeying a direct order for refusing to move his dinner tray from the drink machine; #201 - disobeying a direct order for refusing to be restrained by Carico; and #239a - simple assault upon a non-offender for intentionally bumping Carico. WARSP officials found plaintiff guilty of each of these offenses. However, Warden Watson expunged the offenses of #201 for refusing to be restrained and #198/105A for trying to punch Carico, but he upheld the offenses of #201 for not moving his dinner tray and #239a for bumping Carico.

Shortly after the incident, Harvey directed the Institutional Investigator to review the incident. The investigator reviewed the rapid eye video footage. Although the incident was recorded by multiple cameras, the video footage was not helpful; the camera angles and distance prevented a clear view of the incident. Based on this investigation, it was determined that plaintiff's allegations of an assault by staff and a hate crime were not supported by the available evidence and were deemed unfounded. The VDOC Special Investigations Unit reviewed the investigation and elected to not take further action.

On June 17, 2009, a month after the incident, medical staff saw plaintiff for nursing sick call to review wounds received from the incident. Plaintiff stated, "It's better, I feel fine." Plaintiff refused to have his vital signs taken. The treating nurse noted that plaintiff was alert and oriented with a steady gait. The treating nurse also noted scratches on plaintiff's "left top hand

and right lower top leg." The treating nurse did not note any redness or symptoms or signs of distress. Plaintiff did not tell the treating nurse of another complaint. The treating nurse instructed him to report any complaints regarding the wounds, to which plaintiff agreed. The medical staff has not seen plaintiff for any other complaint from the incident.

Carico denies he called plaintiff racial slurs or names, used unnecessary force, or tried to injure him. Robinson denies punching plaintiff's face, calling him names, or seeing Carico or any other responding members of the security staff use unnecessary force against plaintiff.

The defendants included the affidavit of the WARSP's grievance coordinator, who states plaintiff did not file any regular grievance about his mail being monitored or causing him to miss a state-court deadline to appeal his state criminal convictions.[4] Watson also deemed plaintiff's regular grievance about small segregation trays, small food slots on the segregation trays, and his weight loss unfounded. The grievance coordinator avers that plaintiff did not file an appeal of his grievance for Level II review.

The grievance coordinator also explained that the exhaustion of administrative remedies in VDOC facilities is governed by Operating Procedure 866.1. To exhaust a claim about conditions inside a VDOC facility, an inmate must properly raise his grievance through all levels of the VDOC's Offender Grievance Procedure. See VDOC Operating Procedure 866.1 (Def.'s Br. Supp. Mot. Summ. J. Ex. 1, Encl. A.) Prior to submitting a regular grievance, the inmate must demonstrate that he has made a good faith effort to informally resolve his complaint. (Id. 5-6.) This act may be accomplished by submitting an informal complaint form to the grievance

---

[4]The defendants responded to a portion of plaintiff's complaint discussing his mail. However, as plaintiff also acknowledges, plaintiff is not pursuing a claim about his mail. (Pl.'s Resp. to Defs' Mot. Summ. J. (no. 33) 10.)

6

office, which will forward the complaint to the appropriate department head. If unsuccessful, a regular grievance must be filed within thirty calendar days from the date of the occurrence or incident. (Id. 7.) If the inmate meets the criteria for acceptance,[5] the grievance is logged and staff issue a receipt to the inmate. The grievance coordinator noted that plaintiff's grievance records from his time at the ROSP are kept at her office, pursuant to DOP 866.1, when he files a grievance in accordance with that policy.

If the regular grievance does not meet the criteria for acceptance, the grievance coordinator returns it to the inmate within two working days and explains why the grievance was not accepted. (Id.) A copy of the unaccepted grievance is kept in the inmate's grievance folder for documentation. (Id.) The inmate may resubmit the grievance after complying with the criteria for acceptance. If the inmate wants a review of the intake decision, he may send the grievance to the appropriate Regional Ombudsman for an appeal. (Id. 8-9.)

The Warden or Superintendent of the prison where the grievance is filed, or his or her designee, reviews accepted regular grievances at the institutional level, which is called Level I review. If the inmate is dissatisfied with the Level I determination, he may appeal the determination to Level II. On appeal, also known as Level II review, the Regional Director, Health Services Director, or Chief of Operations for Classification and Records reviews the Level I decision depending on the type of complaint. For most issues, Level II is the final level of review. For those issues appealable to Level III, the Deputy Director or the Director of the VDOC conducts the final review of the regular grievance. The time limit for issuing the Level I response is thirty calendar days, twenty calendar days for the Level II response, and twenty

---

[5]For example, the grievance may only address one issue at a time. See, e.g., id. at 6.

7

calendar days for the Level III response. (Id. 9-10.) Expiration of the time limit at any stage of the process automatically qualifies the inmate to appeal the grievance to the next level of review. Notification of one's appeal rights is indicated in the response form at each level of the decision making process. Records of all regular and emergency grievances are archived for review at the facility where the inmate files it. (Id. 11-12.) Notably, inmates must use the official grievance forms to comply with 866.1. (Id. 2, 6, 7.)

II.

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).[6] Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts admissible as evidence that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); id. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952

---

[6]The parties received reasonable and explicit notice that the court may convert a motion to dismiss that references matters outside the pleadings into a motion for summary judgment when the Clerk issued a timely Roseboro notice. See Fed. R. Civ. P. 12(d); Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975).

F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 248. Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991). A court may not resolve disputed facts or weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility, Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). Furthermore, a party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995).

A. Exhaustion of Administrative Remedies.

Defendants argue that plaintiff did exhaust administrative remedies for his claims about

9

his weight loss and the food quality and portions served to him in segregation. In response to this argument, plaintiff argues that he exhausted these claims, as evidenced by copies of his grievances attached to his complaint.[7] Plaintiff specifically refers to his July 30, 2009, regular grievance; Watson's July 21, 2009, response; plaintiff's July 22, 2009, appeal; and the Regional Director's response to his appeal. (Pl.'s Resp. to Defs' Mot. Summ. J. (no. 33) 10-11.)

The administrative records attached to plaintiff's complaint reveal the following attempts at exhaustion. On June 30, 2009, plaintiff filed a grievance about receiving rotten cole slaw on June 23, 2009. (Attachments (no. 2) 49 (log no. 630-14841).) Watson gave plaintiff a Level I response on July 21, 2009, about the cole slaw served on June 23, 2009. (Id. 48 (log no. 630-14841).) Plaintiff exhausted his administrative remedies after appealing Watson's decision to the Regional Director, who upheld Watson's decision.

On August 19, 2009, Watson gave plaintiff a Level I response to his regular grievance about the SHU trays being very small; receiving inadequate food portions on July 14, 2009; and losing too much weight during his segregation. (Id. 57 (log no. 630-14892).) Watson advised plaintiff that he could note an appeal to the Regional Director. Plaintiff did not provide any evidence of filing an appeal of the Level I decision to the Regional Director for Level II review.

The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust all available administrative remedies before bringing a claim under 42 U.S.C. § 1983, even where the relief sought cannot be granted by the administrative process. 42 U.S.C. § 1997e(a). See Woodford v. Ngo, 548 U.S. 81, 85 (2006) (stating that "[e]xhaustion is no longer left to the discretion of the

---

[7]Plaintiff also filed grievances filed by another inmate that the court will not consider in support of plaintiff's exhaustion attempts.

10

district court, but is mandatory"); Porter v. Nussle, 534 U.S. 516, 532 (2002) (stating that the PLRA applies to "all inmate suits, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong"); Booth v. Churner, 532 U.S. 731, 739 (2001) (finding that the PLRA requires administrative exhaustion prior to the filing of a federal civil rights suit even if the form of relief the inmate seeks is not available through exhaustion of administrative remedies). Pursuant to the PLRA, prisoners must not just initiate timely grievances, but must also timely appeal through all levels of available administrative review any denial of relief. Woodford, 548 U.S. at 93 (holding that the PLRA requires "proper exhaustion" of institutional administrative remedies before filing any federal suit challenging prison conditions). To properly exhaust a claim, an inmate must file grievances with sufficient detail to alert prison officials of the possible constitutional claims which are now alleged as a basis for relief. See Smith v. Rodriguez, No. 7:06-cv-00521, 2007 U.S. Dist. LEXIS 43571, 2007 WL 1768705 (W.D. Va. June 15, 2007) (citing McGee v. Fed. Bureau of Prisons, 118 F. App'x 471, 476 (10th Cir. 2004)). Failure to exhaust is an affirmative defense that defendant has the burden of pleading and proving. Anderson v. XYZ Corr. Health Servs., Inc., 407 F.3d 674, 681 (4th Cir. 2005).

The record reveals that plaintiff failed to exhaust his administrative remedies about the SHU trays, SHU food portions, SHU food quality, and his weight loss. Plaintiff did not seek Level II review of Watson's denial of his grievance concerning these issues. Accordingly, summary judgment is granted as to these claims, and Scarberry will be terminated as a
11

defendant.[8]

B.  Qualified Immunity.

The defendants argue that they are entitled to qualified immunity because the plaintiff fails to state a claim upon which relief may be granted. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Whether a defendant can claim qualified immunity is a pure question of law and is properly determined pretrial. Saucier v. Katz, 533 U.S. 194, 200-01 (2001) (modified by Pearson v. Callahan, 129 S. Ct. 808 (Jan. 21, 2009) (permitting lower courts the discretion to determine which qualified immunity prong to analyze first)).

Qualified immunity is an immunity from suit rather than a mere defense to liability. A plaintiff bears the burden to show that a defendant's conduct violated the plaintiff's right. Bryant v. Muth, 994 F.2d 1082, 1086 (4th Cir. 1993). However, a defendant must demonstrate that the right was not clearly established at the time of the incident to receive qualified immunity. Henry v. Purnell, 501 F.3d 374, 378 (4th Cir. 2007). Accordingly, in order to avoid summary judgment on the basis of qualified immunity, plaintiff must produce sufficient admissible evidence from

---

[8] However, the grievances reveal that plaintiff exhausted administrative remedies about the quality of the cole slaw he received on June 23, 2009. Although exhausted, this issue does not state an Eighth Amendment claim. See White v. Gregory, 1 F.3d 267, 269 (4th Cir. 1993) (affirming dismissal of Eighth Amendment claim about missing one meal as frivolous and indisputably meritless). An inmate is not entitled to relief because he has been exposed to uncomfortable, restrictive, or inconvenient conditions of confinement. See Henderson v. Virginia, 2007 U.S. Dist. LEXIS 70207 at *26, 2007 WL 2781722, (W.D. Va. Sept. 21, 2007) (unpublished). Rather, "[t]o the extent that such conditions are restrictive or even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). Similarly, a plaintiff is not entitled to any relief on this claim if he fails to allege any facts to suggest that he was exposed to an unreasonable risk of harm by virtue of the defendant's conduct. See Farmer v. Brennan, 511 U.S. 825, 835 (1994). Plaintiff does not allege any such risk of harm on the basis of receiving one serving of allegedly spoiled cole slaw.

which a jury could conclude that the defendants employed at least some force against him in a malicious or sadistic manner and that the violated constitutional right was clearly established at the time of the violation.

1. Excessive Force Claims against Carico and Robinson

A convict alleging excessive force must objectively show that a defendant "inflicted unnecessary and wanton pain and suffering." Whitley v. Albers, 475 U.S. 312, 320 (1986). See Wilson v. Seiter, 501 U.S. 294, 298 (1991) (holding that an Eighth Amendment claim for excessive force requires an objective deprivation of a basic human need and that prison officials subjectively acted with a sufficiently culpable state of mind). Therefore, the proper inquiry is whether the force applied was "in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Whitley, 475 U.S. at 320-21. In Whitley, the Supreme Court set forth four non-exclusive factors to assist courts in assessing whether an officer has acted with "wantonness": (1) "the need for the application of force"; (2) the extent of any reasonably perceived threat that the application of force was intended to quell; (3) "the relationship between the need and the amount of force that was used"; and (4) "any efforts made to temper the severity of a forceful response." 475 U.S. at 321 (internal quotations omitted). See Wilkins v. Gaddy, ___ U.S. ___, 130 S. Ct. 1175 (Feb. 22, 2010) (explaining core judicial inquiry is not the extent of the injury but the nature of the force – whether it was nontrivial and applied maliciously and sadistically to cause harm); Hudson v. McMillian, 503 U.S. 1, 7 (1992) (extending the Whitley standard to all allegations of excessive force).

A dispute of a material fact exists as to whether the defendants used excessive force. Carico and plaintiff left the cafeteria to privately continue their conversation from the cafeteria.

13

Carico alleges that plaintiff swung his fist at him, who then restrained defendant by holding him against the ground while struggling to hand-cuff him. However, plaintiff claims he never threw a punch and that the Carico and Robinson leaped on top of him for no penological reason, slammed him face first into the ground, kneed him in the back of the head, knockeda tooth loose, scraped his face against the pavement, and twisted his body into a "U-shape" while calling him racial and religious slurs. Robinson also allegedly punched plaintiff in the face while he was already restrained, and Carico and Robinson allegedly placed plaintiff in backwards leg irons that were too tight, cut him, and caused scars. Although plaintiff received various cuts, welts, and scrapes, he also alleges that he lost a tooth as a result of the incident.

The defendants' allegations support finding a good faith effort to restore discipline; plaintiff's allegations support finding a malicious and sadistic attack for the purpose of causing harm. However, my present role is neither to determine credibility nor or the ultimate factual conclusions; instead, I must resolve any inference in plaintiff's favor. Summary judgment based upon qualified immunity is inappropriate "where what actually happened . . . need[s] to be resolved by the trier of fact in order to reach a decision on the applicability of qualified immunity." Lowery v. Stovall, 92 F.3d 219, 222 (4th Cir. 1996) (quoting Rainey v. Conerly, 973 F.2d 321, 324 (4th Cir. 1992)). If the trier of fact finds that the defendants used excessive force, then it could not be said that it was "objectively reasonable" for them to believe that their actions did not violate the plaintiff's constitutional rights. After viewing the evidence in the light more favorable to the plaintiff, I conclude that sufficient evidence exists to raise a genuine issue of material fact as to whether Carico or Robinson used excessive force against plaintiff, and summary judgment must be denied for this issue. See Johnson v. Jones, 515 U.S. 304, 313, 319-20 (1995) (holding that a

district court's denial of summary judgment because of a genuine issue of material fact is not a "final decision").

    2.    Claims against Watson and Harvey.

Watson and Harvey are entitled to qualified immunity because plaintiff fails to state a claim against them. To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). Supervisory liability under § 1983 may not be predicated only on the theory of respondeat superior. See Vinnedge v. Gibbs, 550 F.2d 926, 929 (4th Cir. 1977). Section 1983 requires a showing of personal fault on the part of a defendant either based on the defendant's personal conduct or another's conduct in execution of the defendant's policies or customs. See Fisher v. Washington Metropolitan Area Transit Author., 690 F.2d 1133, 1142-43 (4th Cir. 1982), abrogated on other grounds by Cnty. of Riverside v. McLaughlin, 500 U.S. 44 (1991). See also Brown v. Mitchell, 308 F. Supp. 2d. 682, 701 (E.D. Va. 2005) (citing City of Canton v. Harris, 489 U.S. 378, 388-92 (1989) (discussing supervisory liability). However, plaintiff fails to establish any policy by Watson or Harvey that caused the alleged excessive force beyond his mere speculation that it often happens at the WARSP and, thus, Watson and Harvey must know of it but fail to correct it. Such unsupported speculation is not sufficient to state a claim. Furthermore, plaintiff acknowledged that he did not tell Harvey immediately after the incident what just allegedly happened. Accordingly, Watson and Harvey are entitled to qualified immunity and will be terminated as defendants.

III.

For the foregoing reasons, I deny plaintiff's motion for reconsideration; grant in part and deny in part defendants' motion for summary judgment; terminate Scarberry, Watson, Harvey, and C/O Roberts as defendants; and direct the Clerk to set the matter for trial. Plaintiff's excessive force claims against Carico and Robinson remain.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to plaintiff and counsel of record for the defendants.

**ENTER**: This 13th day of December, 2010.

Senior United States District Judge