# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| JACOB D. PEYTON IV,  )  |  |
|     Plaintiff  ) |  |
| ) |  |
| v.  ) |  |
| ) | **REPORT AND RECOMMENDATION** |
| J. CARICO and  ) | Civil Action No.: 7:09cv00492 |
| R. ROBINSON,  ) |  |
|     Defendants  ) | By: PAMELA MEADE SARGENT |
| ) | United States Magistrate Judge |

Plaintiff, Jacob D. Peyton IV, an inmate incarcerated at Wallens Ridge State Prison in Big Stone Gap, Virginia, ("Wallens Ridge"), originally filed this action pro se for monetary damages under 42 U.S.C. § 1983 against various employees of Wallens Ridge. By Memorandum Opinion and Order dated December 13, 2010, Jackson L. Kiser, Senior United States District Judge, entered summary judgment in favor of all defendants on all claims other than Peyton's excessive force claim against defendant correctional officers J. Carico and R. Robinson. This remaining claim was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) to conduct an evidentiary hearing and to make a recommended disposition. The undersigned held an evidentiary hearing in this case on March 2, 2011. Based on the evidence presented, the undersigned recommends that the court find in favor of the defendants on Peyton's excessive force claim.

## I. Facts and Analysis

The evidence before the court shows that Peyton was an inmate at Wallens Ridge on May 29, 2009. On this day, Peyton claims that Carico and Robinson knocked him down, pinned him to the ground and beat him for no reason. Peyton testified that he had been an inmate at Wallens Ridge only about a week when attacked by Carico and Robinson. Peyton stated that on May 29, 2009, he went to the C & D Building Dining Hall for the evening meal. After picking up his food tray at the tray slot, he walked to the juice machine and got a cup of juice before going to a table to sit down. Peyton stated that Carico approached him once he arrived at the table and told him to place his tray on the table before getting his juice in the future. Peyton stated that when he did not acknowledge Carico's statement Carico asked, "Did you hear me?" Peyton told Carico, "Yeah, I heard you." He stated that Carico then told him that "Next time, I want eye contact."

Peyton stated that Carico then asked him if he had an attitude problem and asked him to step outside of the Dining Hall. Peyton testified that he exited the Dining Hall first, followed by Carico. Once outside the Dining Hall, according to Peyton, Robinson approached them and Carico said, "We got one of those smart-assed Muslims here." Peyton said that Carico told him to turn around to be placed in handcuffs, and when he did not turn around fast enough, Carico tackled him and took him to the ground for no reason. Peyton testified that Carico put his knee on his head and ground first one side of his face and then the other into the ground, causing abrasions on both sides of his face, cutting his lip and knocking his only remaining front tooth loose. Peyton testified that, while he was on the ground being beaten, the officers called him a "fucking nigger" several times.

Peyton stated that Carico and Robinson bent his legs up and pulled his left arm from under his body causing abrasions to his wrist. Peyton stated that Robinson punched him in the face while he was lying on the ground restrained in handcuffs. Peyton stated that leg irons were improperly applied to him in a way that caused them to cut into his ankles as he was walked to the medical department after the incident.

Peyton also presented testimony from several other Wallens Ridge inmates, only two of whom claim to have witnessed the use of force by Carico and Robinson. Inmate Kionne Pulley testified that he was waiting outside to walk to the C & D Building Dining Hall on May 29, 2009, when he saw Carico dragging Peyton out of the Dining Hall with his hand on Peyton's elbow. Pulley stated that he heard Peyton ask, "Why are you grabbing me?" Pulley stated that he then saw Carico swing at Peyton for no apparent reason, punching Peyton in the face and knocking him to the ground. Pulley said that he then saw "a bunch of correctional officers" on top of Peyton on the ground. When they stood Peyton up, Pulley said he saw blood running down Peyton's face from around his mouth.

Fellow inmate Malcolm Mohammed testified that he, too, was standing outside the C & D Building Dining Hall on May 29, 2009, when Carico and Peyton stepped outside followed by Robinson. Mohammed stated that Carico exited the building first and that when Peyton exited the building, Carico was waiting on him and punched him in the face, knocking him to the ground. Mohammed stated that he saw Robinson beating Peyton while Peyton was lying on the ground. Mohammed stated that after Peyton was on the ground, he heard Carico say, "We got one of them badass black Muslims."

Fellow inmate Tywon Briscoe testified that he was present in the C & D Building Dining Hall on May 29, 2009, and saw Carico approach Peyton. Briscoe said he heard Carico tell Peyton to set his food tray down at the table before going to the juice machine. He then heard Carico ask Peyton, "Did you hear me?" Briscoe stated that Peyton nodded yes and then Carico told him that he wanted eye contact the next time he spoke to Peyton. Briscoe testified that Carico then took Peyton outside. Briscoe stated that he did not see Peyton bump into Carico as he exited the Dining Hall. Briscoe stated that after Peyton and Carico left the Dining Hall, he and other inmates went over and looked out a window in the door. He said that he saw Peyton lying on the ground with Carico's knee on either Peyton's head or neck.

Fellow inmate Scottie Lee Slate testified that he was present in the C & D Building Dining Hall on May 29, 2009, and saw Carico approach Peyton. Slate said he saw Carico approach Peyton at a table and tell him to set his food tray down at the table first before getting juice. Slate said that Carico then asked Peyton to step outside. Slate stated that he did not see any contact between Peyton and Carico as Peyton exited the Dining Hall. Slate stated that after Peyton and Carico left the Dining Hall, he and other inmates went over and looked out a window in the door. He said that he saw Peyton lying on the ground with his arms behind his back and his face pressed to the ground.

Peyton also called inmates Kevin Snodgrass, Terri Turner and John Dobson to testify, but none of these inmates witnessed the events of May 29, 2009. Peyton also offered into evidence a video recording of the C & D Dining Hall at

approximately 4 p.m. on May 29, 2009, taken by one of the prison's time lapse video surveillance cameras. Peyton claims that the video footage proves that Carico did not approach him at the juice machine because, if Carico had done so, he would have appeared on the video recording, and he does not. Peyton also offered into evidence three photographs showing abrasions to both sides of his face and his left wrist. According to Peyton, these photographs were taken on May 29, 2009, by Wallens Ridge officials to document the injuries he sustained.

Carico testified that he was working the C & D Building Dining Hall on May 29, 2009, when he approached Peyton and told him to put his food tray down on the table first before getting juice. Carico stated that Peyton responded, "Fuck you, I am a grown damn man." Carico said he then asked Peyton to step outside with him. Carico stated that as he held the door for Peyton to exit, Peyton bumped into him with his shoulder. Once outside, Carico said that he asked Peyton to turn and face a wall and place his hands on it so that he could "pat down" Peyton for contraband or weapons. Carico stated that Peyton then turned quickly to his left and swung at Carico with a clenched right fist. Carico stated that he grabbed Peyton and that Robinson, who was approaching from across the yard, grabbed Peyton, and they wrestled him to the ground. Carico testified that he used only that amount of force necessary to subdue and restrain Peyton.

Carico stated that he placed handcuffs on Peyton but that he did not place the leg irons on him. Carico stated that after Peyton was placed in restraints, other officers took control of him. Carico denied making any racist or religion comments to or about Peyton that afternoon. Carico admitted that on the Incident Report he completed on May 29, 2009, he stated that Peyton "almost bumped into me" as he

exited the Dining Hall. Carico also admitted that in an affidavit filed with the court he stated that Peyton "intentionally bumped into me" on his way out the door. Carico testified that Peyton did bump him with his shoulder as he exited the Dining Hall. Carico explained the discrepancy in his statement by saying that when he filled out the Incident Report, he thought that the contact was not intentional. After further reflection, he stated that he believed that Peyton intentionally bumped into him.

Robinson stated that on May 29, 2009, he was working the C & D Buildings yard about 15 to 20 feet away when Peyton came out of the Dining Hall followed by Carico. Robinson said he saw Peyton face the wall and place his hands on the wall. As Carico started to pat down Peyton, Robinson said he saw Peyton turn and take a swing at Carico. Robinson said he ran to them and tried to grab one of Peyton's arms as he and Carico fell to the ground. Robinson said that Peyton continued to struggle and fight with both he and Carico while on the ground. After two more correctional officers arrived, they were able to restrain Peyton. Robinson stated that after Peyton was restrained, the other officers took control over him. Robinson said that he did not punch Peyton in the face at any time during the altercation. Robinson also denied ever making any racist or religious comment to or about Peyton.

Wallens Ridge Health Authority Marcia Stanford also testified regarding records of Peyton's medical treatment. Stanford testified that medical records from Wallens Ridge show that on May 29, 2009, a nurse documented that Peyton had two two-to-three centimeter abrasions on the left side of his face, an abrasion on his right cheek and a one-half centimeter laceration on his lip. Stanford also

testified that the prison's medical records showed that, on January 8, 2009, Peyton was seen by the dental department for complaints of his right front tooth being loose.

Peyton argues that Carico and Robinson used excessive force against him in violation of the Eighth Amendment's prohibition against the infliction of "cruel and unusual punishment." U.S. CONST. amend. VIII. This amendment not only prohibits excessive sentences, but it also protects inmates from inhumane treatment and conditions while imprisoned. *See Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996). The unnecessary and wanton infliction of pain by a prison official through the use of excessive force upon an inmate has been clearly established as a violation of the Eighth Amendment's prohibition on cruel and unusual punishment for a number of years. *See Hudson v. McMillian*, 503 U.S. 1, 5 (1992); *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

The determination of whether the use of force by a prison official violates the Eighth Amendment includes both a subjective and objective component. *See Williams*, 77 F.3d at 761 (citing *Wilson v. Seiter*, 501 U.S. 294, 302 (1991)). Not every malevolent touch by a prison guard amounts to a deprivation of constitutional rights. *See Hudson*, 503 U.S. at 9 (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). "[C]ourts considering a prisoner's claim [of excessive force] must ask both if [subjectively] the officials act[ed] with a sufficiently culpable state of mind and if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Hudson*, 503 U.S. at 8 (internal quotations omitted). The most pertinent inquiry under the subjective prong is "whether force was applied in a good-faith effort to maintain or restore discipline,

or maliciously and sadistically to cause harm." *Hudson,* 503 U.S. at 7. In making this determination, the court must balance such factors as the need for the application of force, the relationship between the need and the amount actually applied and the extent of the injury inflicted. *See Hudson,* 503 U.S. at 7. "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated…. This is true whether or not significant injury is evident." *Hudson,* 503 U.S. at 9.

The objective prong of the excessive force analysis asks whether the force applied was more than de minimis. *See* Hudson, 503 U.S. at 9-10. Since mankind has devised some tortures that leave no lasting physical evidence of injury, the courts have recognized that the objective component can be met by the pain itself, even if the inmate suffers no enduring injury. *See Williams,* 77 F.3d at 762. "A prisoner … asserting malicious and sadistic use of force need not show that such force caused an 'extreme deprivation' or 'serious' or 'significant' pain or injury to establish a cause of action." *Williams,* 77 F.3d at 761 (citation omitted).

Previously, Fourth Circuit precedent, using the Supreme Court's decision in *Hudson* as a basis, dictated that in order to prevail on an excessive force claim, the plaintiff must prove more than de minimis injury. *See Norman v. Taylor,* 25 F.3d 1259, 1263 (4th Cir. 1994) (overruled); *Riley v. Dorton,* 115 F.3d 1159, 1166-68 (4th Cir. 1997) (overruled). However, the Supreme Court recently held that "[i]n requiring what amounts to a showing of significant injury in order to state an excessive force claim, the Fourth Circuit has strayed from the clear holding of this Court in *Hudson.*" *Wilkins v. Gaddy,* \_\_\_\_\_ U.S. \_\_\_\_\_, 130 S.Ct. 1175, 1178 (2010). The Court went on to say that the "Fourth Circuit's strained reading of

*Hudson* is not defensible." *Wilkins,* 130 S.Ct. at 1179. The Supreme Court explained that its holding in *Hudson* did not stand for the proposition that a "certain quantum of injury [needed to be] sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Wilkins*, 130 S.Ct. at 1178 (quoting *Hudson*, 503 U.S. at 7). Further, the Court opined that requiring a showing of injury would permit any punishment, "no matter how diabolic or inhuman," absent some quantum of injury. *Wilkins*, 130 S.Ct. at 1178 (quoting *Hudson,* 503 U.S. at 9.) The Court did not want an inmate, who was the victim of excessive force, to lose the ability to pursue an excessive force claim because of "the good fortune to escape without serious injury." *Wilkins,* 130 S.Ct. at 1179. The Court did note, however, that the absence of serious injury is not irrelevant. The extent of injury could indicate whether the use of force was thought to be necessary, and it could provide an indication of the amount of force actually applied. *See Wilkins,* 130 S.Ct. at 1178. A "push or shove," without a resulting discernible injury, almost always fails to state a claim for excessive force because, '"[t]he Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimus uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind.'" *Wilkins*, 130 S.Ct. at 1178 (quoting *Hudson,* 503 U.S. at 9.)

In short, the "core judicial inquiry [is] … the nature of the force – specifically, whether it was nontrivial and 'was applied … maliciously and sadistically to cause harm.'" *Wilkins,* 130 S.Ct. at 1179 (quoting *Hudson*, 503 U.S. at 7.) The Supreme Court in *Whitley* set out several factors which should be considered in determining whether prison officials acted maliciously and

sadistically. In particular, the court should consider:

1) the need for application of force;
2) the relationship between that need and the amount of force used;
3) the threat reasonably perceived by the responsible officials; and
4) any efforts made to temper the severity of a forceful response.

*Williams*, 77 F.3d at 762 (citing *Whitley*, 475 U.S. at 321).

Given the evidence presented at trial, I do not find that Peyton has met his burden of proof on the subjective component of an excessive force claim. In making this finding, I specifically find the officers' version of events more credible than the version of events given by Peyton and his witnesses. While there are discrepancies in both sides' versions of events that day, it is Peyton, who as plaintiff, bears the burden of proof. None of Peyton's own witnesses support his version of the events of May 29. Peyton claims that, once they were both outside the Dining Hall, Carico tackled him because he did not turn around fast enough. Peyton's witnesses, however, claim that they saw Carico punch Peyton in the face knocking him to the ground. Briscoe claimed that he witnessed Carico dragging Peyton from the Dining Hall with his hand on Peyton's elbow. Mohammed claimed that Carico exited the building first and turned to wait on Peyton, punching Peyton in the face as soon as he stepped outside. Based on these discrepancies, I find the testimony of these witnesses not credible.

Furthermore, I find credible Carico's and Robinson's testimony that they used only that amount of force necessary to subdue and restrain Peyton. Both

testified that it was Peyton who turned and swung his fist at Carico. Both testified that they took Peyton to the ground in an effort to subdue him and place him in restraints. Both testified that Peyton continued to struggle until they were able to place him in restraints. Both testified that as soon as Peyton was placed in restraints, they were relieved by other officers who escorted Peyton to the medical department.

That being the case, I find that Peyton has failed to meet the subjective component of his excessive force claim, and, therefore, I find it unnecessary to determine whether he has met the objective component.

For all of these reasons, I find that Peyton has failed to meet his burden of proof on his excessive force claim, and I recommend that the court find in the defendants' favor on this claim.

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Carico and Robinson used force against Peyton on May 29, 2009, but the amount of force used was only that force necessary to subdue and restrain Peyton; and
2. The amount of force used on Peyton by Carico and Robinson on May 29, 2009, was not excessive.

**RECOMMENDED DISPOSITION**

Based on the above-stated reasons, I recommend that the court find in the defendants' favor on Peyton's excessive force claim.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(c) (West 2006):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

ENTERED: This 18th day of March 2011.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE